LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (SBN 144074)
dalegalipo@yahoo.com
Renee V. Masongsong, Esq. (SBN 281819)
rvalentine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

George Rosenberg, Esq. (SBN 62570)
george@rosenberg-lawfirm.com
GEORGE M. ROSENBERG,
A PROFESSIONAL CORPORATION
12100 Wilshire Blvd., Suite 1250
Los Angeles, CA 90025
Telephone: (310) 207-0703
Facsimile: (310) 207-0787

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CYNTHIA BRIONES and MAURICE BRIONES, in each case individually and as successor in interest to Kyle Briones, deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF ONTARIO; STAFFORD CROSS; MIKE GONZALES; MICHAEL MORA; DARRYL BROWN; KYLE MORGAN, and DOES 5-10, inclusive,<br><br>Defendants. | Case No. 5:17-cv-00590-DMG (JPRx)<br><br>**DECLARATION OF RONALD O'HALLORAN, M.D. IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: May 18, 2018<br>Time: 2:00 p.m.<br>Crtm.: 8C (First St. Courthouse) |

**DECLARATION OF RONALD O'HALLORAN, M.D.**

I, Ronald O'Halloran, M.D., declare as follows:

1. I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

2. I am a physician certified by the American Board of Pathology in the medical specialty of Anatomic Pathology and the subspecialty of Forensic Pathology. I have worked full-time as a forensic pathologist and medical examiner for the past 31 years.

3. I graduated from an accredited U.S. medical school, Oregon Health Sciences University, in Portland, Oregon in 1977. While in medical school I also completed an 18 month student fellowship in anatomic pathology, winning an award for excellence in pathology. I successfully completed a residency in anatomic pathology at UCLA hospitals and clinics in 1979. I successfully qualified for and passed the American Board of Pathology examinations in anatomic pathology and forensic pathology in 1980 and 1981, respectively.

4. I have held a California Physician and Surgeon license to practice medicine since 1985, passing an oral examination administered by three licensed physicians in various medical and surgical specialties. California's Physician and Surgeon medical license does not limit the scope of medical practice of licensees. Physicians so licensed can practice general medicine or any of the medical or surgical specialties they want to practice. They are not required to be certified in any of the numerous specialties in medicine, such as cardiology, to diagnose various cardiac disorders, such as cardiac rhythm disturbances.

5. I have practiced diagnostic medicine since 1974. Anatomic pathology and forensic pathology are both primarily diagnostic specialties. From 1974 to 1977 my practice was during medical school under supervision in the University of Oregon Pathology Department. From 1977-1979 my practice was at UCLA Pathology Department as a post-MD resident physician in pathology. From 1979 to

1985 my practice was forensic pathology as Assistant Chief State Medical Examiner in Oregon.  From 1985 to 2013 my practice was forensic pathology in the Ventura County (California) Medical Examiner Office, first as Assistant Chief and then as Chief Medical Examiner.  After my retirement from the full time practice of medicine and forensic pathology in 2013, I have continued to practice forensic pathology on a part-time, consultant basis.

6. Forensic Pathology is the practice medical-legal death investigation.  I have been doing it as my primary medical practice for nearly 40 years. It includes doing autopsies and also includes integrating medical information and circumstantial information to formulate a probable cause of death, sometimes with an autopsy, sometimes without an autopsy. Interpreting cardiac signs, symptoms, and tests are a frequent part of the weekly work routine of a practicing forensic pathologist.

7. One does not need to do the autopsy oneself to understand and interpret the autopsy findings.  At the time of an autopsy, a detailed autopsy report is prepared and numerous photographs are taken to document what was observed during the autopsy. Deaths legally investigated and autopsied by coroner/medical examiners are by their very nature frequently subject to legal scrutiny and litigation, and it is routinely expected that the coroner/medical examiner's autopsy findings and cause of death opinions will be examined critically by other experts and evaluated in court.

8. I have performed over 8,000 autopsies personally in my career, and have testified as an expert on forensic pathology approximately 800 times. I have also personally prepared, signed and attested to the cause of death as the medical examiner on the medical-legal death certificate in excess of 20,000 times as a medical examiner in Oregon and in California.

9. Many of the cases I have handled during my 40-year career as a forensic pathologist involved heart disease and cardiac arrhythmia evaluations, and I have carefully dissected more than 9,000 hearts during my practice.

10. I have also had a special interest in the subject "fatal asphyxia" all my career and most of my scientific published papers have been on the topic of asphyxia deaths. I have had a special interest in sudden deaths in custody temporally associated with restraint procedures for more than twenty-five years. I have studied the phenomenon, written scientific papers on the subject and lectured about it in county, state and national conference forums. During my career I have personally autopsied 5-10 such deaths that happened within my medical examiner jurisdictions and consulted on more than 80 similar deaths in other jurisdictions of the United States.

11. I have reviewed in detail nearly 100 cases where people have died from being restrained in a prone position, including hogtied by police. In those cases, I did not personally conduct the autopsy; rather, I reviewed and relied on the coroner/medical examiner's observations, the autopsy report, and the autopsy photographs. In virtually all of those nearly 100 cases, I had *more* information about the history and circumstances of the officer-involved death available to him compared to the information available to the coroner/medical examiner conducting the autopsy.

12. Based on my years of experience of performing autopsies in cases of in-custody restraint and asphyxia, my review of such cases, my own studies and research, and my review of other studies and publications on the issue, I have no doubt that a person's body position and manner of restraint can in fact cause death by asphyxia.

13. I was retained to offer opinions regarding Mr. Briones' death. In forming my opinions in this case, I have reviewed the following materials:

    i. Coroner Investigation report by Deputy Bradley Coleman;

    ii. Autopsy Protocol report by Dr. Frank Sheridan, Sheriff-Coroner pathologist;

    iii. Autopsy Toxicology Report by NMS Labs;

    iv. Copy of the original (10/11/16) and amended (01/09/17) death certificates, signed by Deputy Wells and Deputy Johnson, respectively;

    v. Ontario PD Supplemental Report 2 by Officer Nicko Carcich (hospital visit and mother notification interview);

    vi. OPD Supplemental Report 15 by Officer Everardo Jimenez (witness Sultan Alnshaiwat interview summary);

    vii. Transcriptions of recorded interviews of the restraining officers: Michael Mora, Darryl Brown, Mike Gonzales, Kyle Morgan, Stafford Cross;

    viii. Taser use report;

    ix. Detailed History for Police event #P162790021 as of 5/29/2017 (dispatch record);

    x. Ontario Fire Department Prehospital Care Report;

    xi. AMR Ambulance Prehospital Care Report;

    xii. Kaiser Ontario Medical Center emergency care medical records Briones 10/5/16;

    xiii. Past medical records from Padmini Tummala, MD;

    xiv. Body Cam Videos of Officers Brown, Cross, Gonzales, Mora and Morgan;

    xv. Transcription of recorded interview at scene and follow-up recorded interview of Sultan Alnshaiwat;

    xvi. Transcriptions of the depositions of the restraining officers: Michael Mora, Darryl Brown, Mike Gonzales, Kyle Morgan, Stafford Cross;

    xvii. Transcription of videotaped deposition of Sultan Alnshaiwat;

xviii. autopsy photographs.

14. In my opinion, the probable cause of death in most prone restraint cases with loss of consciousness during restraint is asphyxia by chest/abdominal compression.

15. "Asphyxia," in the broad sense, means a process causing decreased oxygen availability to cells. It is well accepted that inhibition of respiration (breathing) and/or inhibition of cardiac functional output (blood flow) caused by too much weight on the back for too long can cause asphyxia.

16. Compression of the chest and abdominal area can cause asphyxia in two ways:

    a. Weight on the back of a person who is unable to use the arms or legs to relieve pressure makes breathing more difficult since a person must use the relatively weak muscles of breathing (primarily the diaphragm and intercostal muscles) to expand the chest and lift the weight enough to allow air to passively flow into the lungs during the breathing process. With time and with sustained weight, or too much weight applied over a shorter time, those muscles become exhausted and can no longer lift the weight enough to breathe and deliver oxygen to the blood being pumped through the lungs.

    b. Compression of the thorax can also cause the low-pressure veins bringing blood to the heart to collapse, or the low-pressure chambers of the right side of the heart to collapse as they are compressed against the spine. If that happens, blood cannot get into the heart to be pumped out. Without blood being pumped, oxygen will not get to the brain or to the specialized muscles of the heart. Not getting oxygen to the brain causes loss of consciousness and

eventually death. Not getting oxygen to the heart causes arrhythmias and eventually death, too.

17. It is my opinion that Kyle Briones ultimately died from restraint asphyxia with compression. The asphyxia caused loss of consciousness, respiratory arrest and, finally, cardiac arrest. The ultimately fatal asphyxia occurred during a struggle with and prone restraint procedures by Ontario police officers. The probable trigger for Mr. Briones' asphyxial death was likely the effects of the way he was restrained prone and compressed by the pressure on his back the officers.

18. Based on my review of the materials, Mr. Briones was compressed for six and a half minutes by the combined actions of the five OPD officers involved in the struggle. The collective weight applied to Mr. Briones' back, including the weight of each officer and each officer's gear, was over half a ton.

19. Though weight on Mr. Briones' extended legs did not directly compress the chest and abdomen, it prevented Mr. Briones from drawing his knees up into a kneeling positon, which would relieve much of the compressive force on his obese abdomen, facilitating breathing efforts.

20. Mr. Briones lost consciousness and stopped making gasping sounds very close to the time his hands were finally cuffed behind his back; however, he was held and compressed prone for nearly a minute afterwards while a hobble was wrapped around his unmoving legs.

21. Restriction of breathing with increased oxygen demand can lead to loss of consciousness in less than three minutes from hypoxia. Here, Mr. Briones was restrained and compressed in a prone position for six and a half minutes.

22. In situations of restraint asphyxia by chest compression, anything done to reduce the compressive, restrictive force on the chest, or anything done to decrease the time a subject is forcefully restrained in a restrictive position, can prove lifesaving. Using as little weight on the back as possible for as short a time as possible will decrease the chance of death. Too much weight on the back for too

long, and failure to recognize and respond quickly to a subject's distress and loss of consciousness are the main reasons some people don't survive prone restraint episodes.

23. Rolling the subject onto his side as soon as possible after handcuffing can also prevent death by allowing the subject easier breathing and by allowing blood to flow unimpeded to and through the heart.

24. In many fatal cases, in my experience, restraining officers continue to compress the detainee for several minutes, even after restraints are applied, and even after the subject stops struggling. Sometimes they report thinking the subject is feigning unconsciousness. Sometimes officers report they needed to keep the suspect pinned a while to make sure he didn't start fighting again. Sometimes they offer no reason. Whatever the rational, continuing to compress an exhausted, prone detainee that is already mechanically restrained or who might be unconscious decreases the chance of resuscitation and decreases the possibility of survival.

25. Frequently monitoring the subject to see if he/she is maintaining consciousness is critically important to quickly discover and hopefully prevent an emerging life threatening catastrophe caused by inadequate delivery of oxygen to the brain and heart. Having an officer or other person specifically assigned to closely monitor the subject's mental status, level of consciousness and breathing during the restraint process can prevent an untimely death.

26. Sometimes agonal (near death) muscle twitches, seizures mouth movements and snoring sounds are misinterpreted as continued resistance or evidence that the subject is doing fine medically.

27. The snoring sound that Mr. Briones can be heard making on the body cam videos indicates that Mr. Briones was near death by the time he was rolled onto his side.

28.     The kicking Sgt. Cross described after Mr. Briones was fully handcuffed, when Mr. Briones seemed to stop resisting otherwise and was unresponsive (kicking that prompted continuing prone restraint with compression until hobbling was finished), was likely agonal seizure activity.

29.     Too often each officer involved is focused on his or her own particular part of trying to get the subject mechanically restrained, while being unaware that the detainee's life is slipping away in the officers' collective hands.

30.     Techniques to help prevent asphyxia during subdual and the application of handcuffs and other mechanical restraints are generally not hard to do and have been discussed in police literature for years. The Institute for the Prevention of In-Custody Death (IPICD ipicd.com) located in Henderson, Nevada has put together training materials and frequent conferences that address many of these restraint issues to help police agencies avoid restraint asphyxia.

31.     The presence of a pulse after Mr. Briones went unresponsive indicates that a cardiac arrhythmia did not cause the loss of consciousness and the loss of breathing that led directly to Mr. Briones' death; rather, the fact that he had a pulse after he went unresponsive and stopped breathing supports death by restraint asphyxia.

32.     It is crucial that the coroner/medical examiner understand the detailed factual circumstances of the incident surrounding a person's death to evaluate whether asphyxia was a cause of death. The coroner/medical examiner's opinion about the cause of death in a particular case is not necessarily more accurate than the opinion of a consultant forensic pathologist reviewing the case after the autopsy has been conducted.

33.     People with male pattern central obesity, a protruding belly, have an additional problem with prone compression restraint.

34.     Mr. Briones did not die because of "excited delirium syndrome."

35. Had Mr. Briones not been restrained the way he was on the day of the incident, he would not have died.

36. Mr. Briones' death certificate would more accurately be certified as follows:

> <u>Cause of Death</u>: Asphyxia during prone restraint with compression by police officers (restraint asphyxia)
>
> <u>Other significant conditions</u> (contributing to cause of death but not related to above cause): Obesity and hypertensive heart disease
>
> <u>Manner of death</u>: Homicide
>
> <u>How injury occurred</u>: Subject was restrained prone with chest compression and obstruction of external airway by multiple police officers.

37. It should be noted that Mr. Briones' toxicology report clearly establishes that Mr. Briones did not have any amount of alcohol, methamphetamine, or any other illicit drug or substance in his system at the time of his death.

38. In my opinion, based on my research and experience in closely examining close to 100 deaths wherein a decedent lost vital signs and ultimately died temporally proximate to prone compressive restraint, whether by police or other persons, petechial hemorrhages are commonly absent in many forms of asphyxia. Suffocation by nose and mouth obstruction is a good example and may have played a role in Mr. Briones' death. Tiny pinpoint hemorrhages in the whites of the eyes are simply not diagnostic of asphyxia. One still needs to know the history and circumstances of a death to rule in or rule out asphyxia.

I declare under penalty of perjury that the foregoing is true and correct, and that this was executed this 19th day of April 2018 at Henderson, Nevada.

_____
Ronald O'Halloran, M.D.