LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (SBN 144074)
dalegalipo@yahoo.com
Renee V. Masongsong, Esq. (SBN 281819)
rvalentine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

George Rosenberg, Esq. (SBN 62570)
george@rosenberg-lawfirm.com
GEORGE M. ROSENBERG,
A PROFESSIONAL CORPORATION
12100 Wilshire Blvd., Suite 1250
Los Angeles, CA 90025
Telephone: (310) 207-0703
Facsimile: (310) 207-0787

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CYNTHIA BRIONES and MAURICE BRIONES, in each case individually and as successor in interest to Kyle Briones, deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF ONTARIO; STAFFORD CROSS; MIKE GONZALES; MICHAEL MORA; DARRYL BROWN; KYLE MORGAN, and DOES 5-10, inclusive,<br><br>Defendants. | Case No. 5:17-cv-00590-DMG (JPRx)<br><br>**DECLARATION OF ROGER A. CLARK IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: May 18, 2018<br>Time: 2:00 p.m.<br>Crtm.: 8C (First St. Courthouse) |

# DECLARATION OF ROGER A. CLARK

I, Roger A. Clark, declare as follows:

1. I am a police practices expert specializing in the procedures of police practices and proper police tactics, including proper procedures for the detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2. I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

3. My opinions are based in part on my training, professional experience and education. I am a twenty-seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I hold a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5).

4. As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted investigation and apprehension methods.

5. During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. I also lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

6. During the last five and one-half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major

(career) criminals. I held this position until my retirement from the Department on March 31, 1993. The majority of our cases were homicide cases. Arrests frequently occurred in dynamic circumstances including crimes in progress.

7. As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer involved shootings. Since my retirement, I have testified as an expert on jail procedures and jail administration, police procedures, police tactics, investigative procedures, shooting scene reconstruction, trajectory, bullet casings and police administration in Arizona State Courts, California Courts, Washington State Courts and Federal Courts in California, Texas, Colorado, Illinois, Indiana, Pennsylvania, and Washington. I have been certified in hundreds of federal and state cases as a police practices and use of force expert – specifically in numerous cases as an expert on the general use and deployment of hobble restraints – and whose use of force experience and expertise has been recognized by the Ninth Circuit on several occasions.

8. I have consulted and/or testified as an expert in dozens of cases regarding the use of hobble restraints, and has been certified as an expert on the general use and deployment of hobble restraints in both State and Federal Courts.

9. Each time I have provided opinions as to whether the police involved acted reasonably under the circumstances; in doing so, I explained within my corresponding report, at deposition, or at trial, what officers are taught with regard to defining positional asphyxia, how it occurs, the dangers of it, and how to prevent it.

10. I have reviewed the following materials in this case:
    (a) Plaintiffs' Second Amended Complaint;
    (b) Audio and video files as follows: 2016-10-05_01.24.36_Ch3; 2016-10-05_01.30.53_Ch17; 2016-10-05_01.37.45_Ch17;

AXON_Flex_Video_2016-10-05_0125; AXON_Flex_Video_2016-10-05_0125-file 2; AXON_Flex_Video_2016-10-05_0124; AXON_Flex_Video_2016-10-05_0128; AXON_Flex_Video_2016-10-05_0129; OP161000260 RADIO;

(c) Transcripts of the depositions of the following individuals: Officer Darryl Brown; Cpl. Mike Gonzales; Officer Michael Mora; Sgt. Stafford Cross; Officer Kyle Morgan; Sultan Nshaiwat; Officer Robert Wightman; Officer Neil Beresford; Officer William Hastings; Officer Alex Villalpando; Detective Darryl Lauritzen;

(d) Transcripts of the recorded interviews of the following individuals: Sultan Alnshaiwat (one interview by Detective Schloepp and one interview by Officer Hastings); Officer Darryl Brown; Cpl. Mike Gonzales; Officer Michael Mora; Sgt. Stafford Cross; Officer Kyle Morgan;

(e) Ontario Police Department Policy 300 – Use of Force;

(f) Ontario Police Department Policy 306 – Handcuffing and Restraints;

(g) Ontario Police Department Policy 502 – Traffic Collision Reporting;

(h) Ontario Police Department Dispatch Log (OPD 0001-0006);

(i) Ontario Fire Department Dispatch Log (OPD 0013-0014);

(j) Ontario Fire Department Pre-Hospital Care Report (OPD 0015-0024);

(k) Ontario Police Department Major Incident Log (OPD 0063-0064);

(l) TASER Download (OPD 0091-0105);

(m) Autopsy report for Kyle Briones;

(n) Images of the incident scene, via the Internet;

(o) Photographs of Mr. Briones' vehicle;

(p) Supplemental Report by Officer Robert Wightman (OPD 0124);

(q) POST Basic Learning Domains as follows:

 #1: "Leadership, Professionalism, and Ethics"

 #2: "Criminal Justice System"

 #3: "Policing in the Community"

 #5: "Introduction to Criminal Law"

 #15: "Laws of Arrest"

 #20: "Use of Force"

 #21: "Patrol Techniques"

 #23: "Crimes in Progress"

 #31: "Custody"

 #33: "Arrest Methods/Defensive Tactics"

 #34: "First Aid and CPR"

 #37: "People with Disabilities"

(r) Nationally recognized law enforcement training regarding Restraint/Positional Asphyxia, as follows:

- The Los Angeles Police Department Training Bulletin: "In-Custody Deaths" (July 1999)
- Training Video produced by the Georgia Bureau of Investigation: "Preventing Restraint Asphyxia"
- Training Video produced by the New York Police Department: "Best Practices, Positional Asphyxia"
- National Law Enforcement Technology Center: "Positional Asphyxia - Sudden Death" (June 1995)
- "Restraint and Sudden Death," Donald T. Reay, M.D. http://www.fbi.gov/publications/leb/1996/may966.txt
- "Positional Asphyxia And Sudden Death" (U.S. Department of Justice)

- http://www.zarc.com/english/other_sprays/reports/positional_asphyxia.html

11. I make this declaration and my opinions based on my review of these materials, and also based on my experience and knowledge of police training, standards and policies.

12. Sgt. Cross and Officers Brown, Mora, Gonzales, and Morgan lacked reasonable suspicion to detain Mr. Briones and lacked probable cause to arrest him. Mr. Briones had been involved in a single vehicle collision and the officers were responding to a "man down" call. The officers had no information that Mr. Briones had been engaged in any criminal activity, no information that Mr. Briones was intoxicated, and no information that Mr. Briones had a weapon.

13. Based on their observations that Mr. Briones was bleeding and had just been in a car accident, the officers would understand (per their training) that Mr. Briones would be disoriented and cognitively impaired as a result of the accident. The condition of the vehicle and the officers' observation that it was steaming indicates that the vehicle impact was serious. Even taking the officers' account as true (that they suspected Mr. Briones to be under the influence), then they would have contemplated that Mr. Briones' understanding and compliance would be altered, and should have adjusted their approach accordingly.

14. Based on video evidence, the officers immediately removed Mr. Briones from his vehicle when no obvious sign of impending danger was present. There is no evidence that Mr. Briones' vehicle was on fire or in danger of catching fire.

15. Officers are trained that, absent the threat to life, that they should thoroughly assess an injured (including bleeding) person prior to attempting to move the individual.

16. Pursuant to POST Learning Domain #34, "First Aid, CPR, and AED," officers are trained as follows: "Do Not Move. More harm can be done to a victim by moving them then by the original injury. This is especially true if a spinal cord injury is suspected. DO NOT MOVE any victim unless it is absolutely necessary for scene safety, patient safety or officer safety."

17. The officers violated basic police officer training and standards when they moved Mr. Briones, and as such subjected Mr. Briones to further injury and eventually death. The officers should have kept Mr. Briones stable and in his vehicle and waited for trained paramedics, whom the officers knew were arriving within minutes.

18. The evidence indicates that the paramedics were staged, having arrived on scene at 1:27:11 a.m. and having contacted Mr. Briones at 1:34 a.m. It was unreasonable for the officers to stage the paramedics because Mr. Briones did not pose a threat to anyone at any point during this incident, particularly after he was handcuffed.

19. The evidence indicates that staging the paramedics delayed the provision of medical treatment to Mr. Briones and contributed to Mr. Briones' injuries and death.

20. I see nothing whatsoever that justifies the use of force and restraint inflicted on Mr. Briones, including but not limited to the use of the Taser, five officers restraining Mr. Briones in a prone (face and chest down) position, the use of a hobble, Sgt. Cross standing or kneeling on the backs of Mr. Briones' legs, the officers placing their body weight on Mr. Briones, Officer Brown placing his knee on Mr. Briones' upper back to keep him down, including after he was handcuffed, and Officer Brown pressing Mr. Briones' face into the dirt.

21. POST training states that all force applied by police must be objectively reasonable. In order to be reasonable, the type and amount of force used in any situation must match the circumstances facing the officer(s). Factors to be considered include: the nature of the crime (felony versus misdemeanor, violent versus non-violent), the actions of the suspect (passively non-compliant, actively non-compliant, or assaultive/combative), the presence and type of any weapons, the physical size and number of the suspects versus the size and number of the officers, and other resources at hand.

22. Here, Mr. Briones had committed no crime. No witness or officer reported being threatened by Mr. Briones or seeing him with any weapon. No one reported being injured by Mr. Briones. The officers had no information that Mr. Briones was intoxicated and did not smell any alcohol or see any evidence of alcoholic beverages. The officers never should have forced Mr. Briones to sit down and never should have handcuffed him. Both the detention and the scope and manner of the detention were unreasonable.

23. Mr. Briones was restrained collectively by five officers, including Officer Brown (5' 10" and 210 lbs.), Officer Mora (5' 10" and 175 lbs.), Officer Morgan (6' 1" and 185 lbs.), Officer Gonzales (5' 8" and 186 lbs.), and Sgt. Cross (5' 7" and 210 lbs.). The equipment the officers were wearing at the time of the incident added an additional twenty to thirty pounds to the weight of each officer.

24. Throughout the incident, any resistance by Mr. Briones was minimal and did not justify any of the force used against him. Any minimal "resistance" by Mr. Briones amounted to not wanting to sit down on the ground and his response to the uses of force when he was Tased, handcuffed, and hobbled in a prone position with weight on his back. This minimal resistance did not amount to probable cause to arrest Mr. Briones.

25. Mr. Briones was never assaultive or violent and was never a threat to any of the officers. Other than minimally moving his legs while compressed in a prone position, throughout the entirety of this incident, Mr. Briones never hit, kicked, punched, or verbally threatened anyone.

26. The use of a Taser was inappropriate in this case.

27. The evidence, including the RP's testimony and the video, indicates that Mr. Briones was initially compliant and cooperative.

28. It is a national standard that police officers are trained (1) regarding positional and/or restraint asphyxia, (2) that prone body positions and certain methods of restraint can cause difficulty breathing and can result in death by asphyxia, (3) the risk for asphyxial death is compounded following a struggle with the officer, (4) the risk for asphyxia death is compounded by applying pressure to a suspect while they are in a chest and/or stomach down position, and (5) how to avoid certain methods of restraint, and safely restrain suspects, so as to prevent such death. Any respectable law enforcement agency would be expected to have this training.

29. Properly police training includes the "physiology of a struggle," in other words, that if a person is chest down with weight on his back, the person could be attempting to lift up to assist in their breathing, and the officer perceives this as resistance and pushes the person back down.

30. Police officers are trained that if a subject has difficulty breathing, they should immediately remove all restraints, including hobbles and handcuffs, and turn the subject onto his side or place him in a seated position, to help the subject breathe. Again, any respectable law enforcement agency would have this training. The officers did not immediately remove the handcuffs from behind Mr. Briones or the hobble from his legs after they noticed he was unconscious, was possibly not

1  breathing, and had become unresponsive. The officer defendants had to be
2  instructed by Sgt. Wightman to turn Mr. Briones onto his side, and the officers did
3  not remove the handcuffs and hobble until after the paramedics were permitted to
4  approach Mr. Briones.

5  31.  Sgt. Cross and Officers Brown, Gonzales, Mora, and Morgan violated
6  their training and police standards.

7  32.  The evidence shows that Officer Brown placed his hand on the back of
8  Mr. Briones' head and neck to keep him down, and also placed his knee on Mr.
9  Briones' back to keep him down. This was unreasonable and excessive, especially
10 after Mr. Briones was already handcuffed.

11 33.  Sgt. Cross standing or kneeling on Mr. Briones' legs, and the officers
12 putting pressure on Mr. Briones' back was inappropriate. This violated training and
13 standards that deputies should not put weight or pressure on someone restrained in
14 this fashion because it can make it more difficult for the subject to breathe.

15 34.  The use of the hobble was not necessary in this case. The evidence
16 shows that Mr. Briones was generally unresponsive and not moving after he was
17 handcuffed.

18 35.  Sgt. Cross and Officers Brown, Gonzales, Mora, and Morgan
19 collectively failed to intervene and/or stop the unnecessary and excessive force
20 inflicted on Mr. Briones. They should have intervened to turn Mr. Briones onto his
21 side or put Mr. Briones in an upright seated position instead of a face, chest, and/or
22 stomach down position, to prevent pressure being applied to him while he as in a
23 face, chest, and/or stomach down position, and to prevent Mr. Briones being left in
24 that position for an extended period of time.

25 36.  The record indicates that none of the officers sought medical treatment
26 as a result of this incident.

37. The record indicates that the OPD, and their respective chains of command, endorsed the reckless and dangerous tactics that occurred during this incident.

38. The OPD utterly failed to properly train their personnel regarding the required response to medical emergencies and also with respect to the required procedures to avoid positional and or restraint asphyxia injuries and deaths. This gross failure to train resulted in Mr. Briones' death.

39. Officers are generally trained that obesity makes a person more susceptible to positional and restraint asphyxia.

I declare under penalty of perjury that the foregoing is true and correct, and that this was executed this 19th day of April 2018 at Santee, California.

_____
Roger A. Clark