1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

CYNTHIA BRIONES, et al.,

               Plaintiffs,

     v.

CITY OF ONTARIO, et al.,

               Defendants.

Case No.: ED CV 17-590-DMG (JPRx)

**ORDER RE DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT [39]**

      This matter is before the Court on Defendants City of Ontario, Stafford Cross, Mike Gonzalez, Michael Mora, Darryl Brown, and Kyle Morgan's motion for partial summary judgment ("MSJ") [Doc. # 39].  All of the Officers were employees of the Ontario Police Department ("Ontario PD") at the time of the underlying incident.[1] Having duly considered the parties' written submissions, the Court **GRANTS in part and DENIES in part** Defendants' MSJ.

---

[1] The individual defendants are collectively referred to herein as "the Officers."

# I.

## PROCEDURAL BACKGROUND

On March 28, 2017, Plaintiffs Cynthia Briones and Maurice Briones filed this suit on behalf of themselves and the estate of Kyle Briones, their deceased son.  Complaint [Doc. #1].  On August 28, 2017, the Brioneses filed the operative complaint, which alleges Defendants violated Kyle's constitutional rights under 42 U.S.C. § 1983, their right to familial relations with Kyle, and that the City of Ontario is liable as a municipality under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), and several California state law claims.  Second Amended Complaint ("SAC") [Dkt. 29].  On April 6, 2018, Defendants filed their MSJ.  The motion is now fully briefed.  [Doc. ## 39, 44, 48.]

Defendants move for partial summary judgment on Plaintiffs' claims for: (1) unreasonable search and seizure—detention and arrest; (2) unreasonable search and seizure—denial of medical care; (3) due process—interference with familial relationship; (4) municipal liability—ratification; (5) municipal liability—inadequate training; (6) municipal liability—unconstitutional custom, practice, or policy; and (7) false arrest. MSJ at i.  Defendants acknowledge that whether the force used against Kyle was reasonable is a jury question, and thus do not seek summary judgment on Plaintiffs' claims for: (1) unreasonable search and seizure—excessive force; (2) battery; (3) negligence; and (4) violation of California Civil Code § 52.1.  *Id.* at 2.

# II.

## FACTUAL BACKGROUND[2]

The Court sets forth the following undisputed material facts and views them in the light most favorable to Plaintiffs.

---

[2] Each side submitted a Statement of Uncontroverted Facts ("SUF") [Doc. # 39-1] and a separately numbered Statement of Additional Material Facts ("SAF") [Doc. # 45].  Defendants also filed evidentiary objections to the SAF.  [Doc. # 50.]  The Court rules on the evidentiary objections insofar as the evidence is relevant to the MSJ disposition.  To the extent the Court does not rely on evidence to which an evidentiary objection was interposed, the objection is **OVERRULED** as moot.

**A.      The Incident**

Just after 1:00 a.m. on October 5, 2016, Ontario police officers received a report of a possible solo-vehicle crash with a man in the driver's seat and the engine still running. SUF at ¶ 1; SAF at ¶¶ 32-33.  Police and paramedics were simultaneously dispatched to the crash scene.  SUF at ¶ 13.  When the first officer arrived at the crash scene, Kyle's car was in the middle of a dirt field.  *Id.* at ¶ 2.  Officers knew that Kyle was bleeding and needed medical attention.  SAF at ¶¶ 35, 37.

The first officer on scene discovered Kyle, who was visibly obese, with his eyes closed and slumped over the steering wheel.  SUF at ¶ 3; SAF at ¶ 46.  The officer tried to wake Kyle by tapping on his shoulder and saying, "Sir. Sir, you need to wake up." SUF at ¶ 4.  When Kyle woke after 10-20 seconds, he looked confused.  *Id.* at ¶¶ 5-6.  As the Officers led Kyle away from his car, he appeared wobbly and was unsteady on his feet.  *Id.* at ¶ 7; SAF at ¶¶ 59-62.  The Officers believed that Kyle's car was steaming.[3] SAF at ¶ 58.  The field of soft dirt made it difficult for the Officers and Kyle to walk, and dust filled the air.  SAF at ¶¶ 42-44.  At this moment, Officer Mora opined that Kyle was intoxicated, stating "the mother fucker is drunk."  SUF at ¶ 8; SAF at ¶ 49.  But neither Officer Mora nor any other witness smelled alcohol on Kyle or saw any evidence of alcoholic beverages.  SAF at ¶ 48.

As the Officers escorted Kyle away from his car, he turned back and started moving towards his vehicle.  *Id.* at ¶ 9.[4]  The Officers ordered Kyle to sit on the ground, but he refused.  *Id.* at ¶ 10.  Therefore, at around 1:25 a.m., Officers Mora and Gonzalez pulled Kyle to the ground.  *Id.* at ¶¶ 9, 14; SAF at ¶¶ 66-68.  When the Officers took Kyle

---

[3] Plaintiffs dispute that Kyle's car actually was steaming.  SAF at ¶ 7 (contesting that the video of the incident shows the car steaming).  From the body camera video, the Court was able to see what appeared to be steam coming from the front hood of the car.

[4] Plaintiffs dispute this fact on the basis that Officer Mora's deposition is the only evidence supporting this fact and because it is self-serving.  SAF at ¶ 9.  But the Court "may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature."  *Nigro v. Sears, Roebuck, & Co.*, 784 F.3d 495, 497 (9th Cir. 2015).  Plaintiffs have not presented any evidence contradicting this assertion.  Thus, this fact is deemed uncontroverted for the purpose of this MSJ.

to the ground, they put him in a prone position, i.e., face and chest to the ground.  SAF at ¶ 69.

While Kyle was on the ground, he resisted the Officers' attempts to subdue him and tried to get back up.  SUF at ¶ 11.  Simultaneously, Officers Brown, Gonzales, Cross, Morgan, and Mora held Kyle down.  SAF at ¶ 75.  The Officers placed their weight on Kyle to prevent him from getting up or rolling to his side.  *Id.* at ¶¶ 77-79.  Officer Brown held Kyle in a prone position by placing his hand on Kyle's back.  *Id.* at ¶ 84.  And as Kyle was lifting his chest off the ground, Officers Brown, Mora, and Gonzales held Kyle's upper-back to prevent him from rising.  *Id.* at ¶ 86.  Kyle was trying to lift his chest, but the Officers kept him prone for three to four minutes.  *Id.* at ¶ 80.  Sergeant Cross placed a knee on Kyle's lower back for between one to two minutes.  *Id.* at ¶¶ 92-93.  During this encounter, Officer Morgan also deployed his Taser on Kyle in the probe and dry stun mode.  *Id.* at ¶ 90.  Kyle screamed and groaned as the Officers tried to handcuff him.  *Id.* at ¶ 73.  After handcuffing Kyle, one of the Officers placed a hobble (leg restraint) on Kyle while he was still prone.  *Id.* at ¶ 105.

After Kyle had been on the ground for five minutes and was restrained, Sergeant Cross asked whether he could breathe while he was still face and chest down.  *Id.* at ¶¶ 17, 100.  Cross said, "I just want to make sure we don't smother him."  *Id*.  There is no evidence in the record of any audible response from Kyle, but one of the officers responded that Kyle was breathing and then that he could feel a pulse.  After questioning whether Kyle could breathe, about one minute passed before the Officers turned Kyle on his side.  *Id.* at ¶ 104.  Approximately 30 seconds elapsed between Kyle being hobbled and being turned on his side.  *Id.* at ¶ 117.  Five minutes after the paramedics arrived, Sergeant Wightman allowed the paramedics to treat Kyle.  *Id.* at ¶¶ 108-10.  About 20 seconds after Kyle was turned on his side, he began making a snoring sound.  *Id.* at ¶ 119.  Other than the snoring sound, the Officers did not hear Kyle breathing.  *Id.* at ¶ 122.  But once Kyle was turned on his side, Officer Brown discovered a pulse on Kyle.  *Id.* at ¶ 123.

At around 1:34 a.m., approximately nine minutes after the Officers began to struggle with Kyle, SUF at ¶ 14, the paramedics reached Kyle and were able to begin treating him. SAF at ¶ 124. Kyle had no pulse and was not breathing by this time. *Id.* at ¶ 127. Shortly after the incident, Kyle died. *See id.*

**B.    Ontario PD's Training Procedures**

The Ontario PD does not have any written training materials specifically discussing positional or restraint asphyxia nor does it train its officers that positional or restraint asphyxia can occur. SAF at ¶ 149. According to the Ontario PD's "Guidelines for Use of Leg Restraints":

> Once secured, the person should be placed in a seated or upright position, secured with a seat belt, and shall not be placed on his/her stomach for an extended period, as this could reduce the person's ability to breathe. The restrained person should be continually monitored by an officer while in the leg restraint. The office should ensure that the person does not roll onto and remain on his/her stomach.

*Id.* at ¶ 150. Officers are trained to turn a subject onto his side or sit the subject up after he is restrained. *Id.* at ¶ 151. The Ontario PD does not teach its officers that applying pressure to a person's chest could affect the person's ability to breathe. *Id.* at ¶ 152. Nor does the Ontario PD teach its officers that obese persons are more susceptible to positional and restraint asphyxia. *Id.* at ¶ 167. In fact, the Ontario PD trains its officers to handcuff a subject before worrying about turning a person on his side or seating the person. *Id.* at ¶ 153. Ontario PD also does not train its officers in the "physiology of a struggle"—the process in which a person with his chest on the ground and weight on his back may try to lift his chest up to breathe. *Id.* at ¶ 156. What is more, Ontario PD does not train its officers that placing weight on a subject's back while the subject has his face and chest to the ground could affect the subject's ability to breathe. *Id.* at ¶ 157.

Officer Mora, for instance, does not recall receiving training from Ontario PD about positional or restraint asphyxia, or that a suspect may struggle to breathe if he is

being hobbled. *Id.* at ¶¶ 160-62. Officer Brown, however, has been trained to put a suspect on his side, as opposed to the chest, to help him breathe. *Id.* at ¶ 163. And Officer Gonzales did have training that placing a suspect in a prone position for a prolonged period and placing weight on him could interfere with his ability to breathe, leading to death. *Id.* at ¶ 164. Ontario PD did not facilitate any discussion, debriefing, or retraining in response to Kyle's death. *Id.* at ¶ 165.

### III.

### LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the nonmoving party." *Id.*

IV.

DISCUSSION

**A.     Claims Against Individual Officers**

Defendants contend that the Officers are entitled to summary judgment based on qualified immunity on Plaintiff's claims for: (1) detention and arrest without reasonable suspicion or probable cause; (2) denial of medical care; and (3) interference with familial relationship.[5]

Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The applicability of qualified immunity is typically a question of law. *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008); *cf. Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1168 (9th Cir. 2013) ("it sometimes proves necessary for a jury to determine first whether the mistake [as to fact or law giving rise to an unconstitutional act] was, in fact, reasonable . . . ."). To determine whether government officials are entitled to qualified immunity, courts use a two-prong test. *Pearson*, 555 U.S. at 232. First, the Court determines whether the plaintiff has shown a violation of a constitutional right. *Id.* Second, the Court determines whether the law was clearly established at the time of the defendants' misconduct. *Id.* If the answer to both is yes, then qualified immunity does not apply. *Id.* The Court may start its analysis with either prong. *Id.* at 236.

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Supreme Court precedent "do[es] not require a case directly on point," but clearly established law should not be defined "at a

---

[5] Although Defendants characterize their argument as one for qualified immunity, most of their briefing is devoted to a discussion of whether there is a triable issue of fact on the merits of the claims.

high level of generality." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 741). "The dispositive question is 'whether the violative nature of particular conduct is clearly established,'" and that inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 742 and *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (*per curiam*)). Plaintiffs bear the burden of proving that the right at issue was clearly established. *Alston v. Read*, 663 F.3d 1094, 1098 (9th Cir. 2011).

The Court will first analyze whether Plaintiffs have shown a violation of a constitutional right before considering whether that right was clearly established. After all, "it often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be." *Pearson*, 555 U.S. at 236 (citation omitted).

### 1. Detention and Arrest

The police must not "interfere with the freedom of private persons unless it be for specific, legitimate reasons." *Duran v. City of Douglas*, 904 F.2d 1372, 1376 (9th Cir. 1990) (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). The Fourth Amendment permits the police to stop and briefly detain a person for investigative purposes if they have reasonable suspicion that criminal activity is occurring. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Officers have reasonable suspicion to stop a person if based on the totality of the circumstances, the officers have a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). Typically, whether reasonable suspicion exists is a question for the jury. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 872 (9th Cir. 1993). Nonetheless, the threshold questions in the immunity analysis of whether the law governing Defendants' conduct is clearly established and whether the facts alleged can support the existence of reasonable suspicion or probable cause are questions of law. *Id.* at 873.

Here, viewing the evidence in the light most favorable to Plaintiffs, there are conflicting inferences to be drawn from the material facts that prevent the Court from determining as a matter of law that the Officers had reasonable suspicion to detain Kyle. The undisputed facts show that dispatchers told the Officers that a man was discovered in a field in a single-car accident, and in need of medical aid.  SUF at ¶¶ 1-3; SAF at ¶¶ 46-47.  There is also evidence that when the Officers first made contact with Kyle, he was dazed, unresponsive, and unsteady on his feet.  SUF at ¶¶ 3-7.  Defendants argue that based on these facts alone, there was reasonable suspicion that Kyle was driving under the influence.  MSJ at 6.  They also contend that it was appropriate for the Officers to detain him to investigate a potential crime.  According to Defendants, once Kyle began resisting detention, the Officers had probable cause to arrest him.  *Id.* at 6-7 (citing Cal. Penal Code § 148).  But Plaintiffs point out that the Officers did not smell any alcohol on Kyle and that one officer determined that Kyle was drunk before even making contact with him.  SAF at ¶¶ 48-49.  Moreover, Plaintiffs assert that Kyle's unsteadiness on his feet is much ado about nothing because he was walking on soft dirt after a car accident.  *Id.* at ¶ 42.  Plaintiffs argue that Defendants' evidence equally supports the inference that Kyle was hurt and in need of medical aid.  Opp'n at 5.  Because any number of plausible innocent conclusions can be drawn from these facts that no criminal activity was afoot, the court cannot declare the existence of reasonable suspicion as a matter of law.  *See Act Up!/Portland*, 988 F.2d at 872.  The same is true as to whether the Officers had probable cause to arrest Kyle for being uncooperative because whether the arrest was supported by probable cause is premised in part on whether there was reasonable suspicion to detain Kyle in the first place.  MSJ at 6-7.

Notwithstanding that the Court has concluded that a triable issue exists as to whether the Officers had reasonable suspicion and probable cause to detain and arrest Kyle, the Court now considers whether qualified immunity shields the Officers.  As discussed above, it is the Plaintiffs' burden to show that Defendants violated clearly established law.  *Alston*, 663 F.3d at 1098.

1    In support of their position that the Officers violated clearly established law,
2    Plaintiffs rely on *Duran* and *Amili v. City of Tukwila*, 31 F. Supp. 3d 1274, 1284 (W.D.
3    Wash. 2014).[6]  Neither case, however, is helpful.  In *Duran*, the Ninth Circuit held that
4    police officers lacked reasonable suspicion to arrest the plaintiff for yelling profanities
5    and making obscene gestures because those actions, although crass, are not crimes.
6    *Duran*, 904 F.3d at 1377.  In fact, the Court held that the First Amendment protected the
7    plaintiff's crass conduct.  *Id.* at 1378 (citing *Houston v. Hill*, 482 U.S. 451, 461 (1987)).
8    This case is plainly different because there are no allegations that Kyle was engaging in
9    any constitutionally protected activities when he was arrested.

10    In *Amili*, police received reports of a fight breaking out near a party bus near a
11    mall.  *Amili*, 31 F. Supp. 3d at 1276.  In searching for suspects involved in the fight, the
12    police officer in *Amili* stopped two African American boys, who were walking at night
13    along the side of the road and away from the mall, to question them about the fight.  *Id.*
14    Because the officer did not have an articulable basis for believing the boys were involved
15    with the reported fight, the Court held that there was neither reasonable suspicion to stop
16    them nor probable cause to arrest them.  *Id.* at 1280.

17    In contrast, the Officers in this case discovered Kyle potentially unconscious,
18    behind the wheel, and dazed.  Whereas there was no potential articulation of reasonable
19    suspicion in *Amili*, *see id.* at 1283 (granting summary judgment to plaintiffs on issue of
20    whether reasonable suspicion exists), the Officers here had an articulable basis for
21    believing, even if mistakenly, that Kyle was under the influence and resisting detention:
22    a single vehicle veered off the road into an empty field in the wee hours of the morning,
23    Kyle seemed dazed and confused and was unsteady, he tried to return to his car while
24    being led away by officers, and he began to struggle with the officers and would not
25    submit to their authority.  In sum, there is no clearly established law that prohibited
26    Defendants from conducting an investigatory stop under these circumstances.

27
28
_____

[6] Courts may rely on other district courts' orders to determine whether a law is clearly established.  *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003) ("In the absence of binding precedent, a court should look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts." (brackets, internal quotation marks, and citations omitted)).

Because Plaintiffs have not shown that Defendants' conduct is prohibited by clearly established law, qualified immunity applies.  Indeed, the Court could not find any case in which a court has held that a car crash and with a dazed driver does not give rise to reasonable suspicion of driving under the influence of some intoxicant.  Nor could the Court find any case law holding that there is no probable cause to arrest when a suspect fails to submit to authority while detained during an investigation into a car crash.  Accordingly, the Court **GRANTS** Defendants' motion for partial summary judgment on Plaintiff's claim for detention without reasonable suspicion and arrest without probable cause based on the existence of a qualified immunity.

### 2.  Denial of Medical Care

Defendants contend that the Officers did not violate the Fourth Amendment by denying medical care because they allowed Kyle to receive medical aid promptly after he was arrested.  MSJ at 8.  Once the Officers subdued Kyle, they immediately allowed medical personnel to tend to him.  *Id.*  Plaintiffs respond that the Officers denied Kyle medical care because they did not allow the paramedics to render aid to Kyle until he became unresponsive.  Opp'n at 13.  What is more, Plaintiffs note that the Officers allowed Kyle to remain prone for too long, thus causing him to die from asphyxia.  *Id.* at 14.

The Fourth Amendment requires police officers to seek medical attention for a detainee who has been injured during detention.  *Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1098-99 (9th Cir. 2006); *Ostling v. City of Bainbridge Island*, 872 F. Supp. 2d 1117, 1129 (W.D. Wash. 2012); *see also City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (holding detainees who have been injured by the police have a right under the Due Process Clause to receive appropriate medical care).  Courts analyze claims for failure to render post-arrest medical aid under the Fourth Amendment's reasonableness standard.  *Ostling*, 872 F. Supp. 2d at 1129.  But "[j]ust as the Fourth Amendment does not require a police officer to use the least intrusive method of arrest, neither does it require an officer to provide what hindsight reveals to be the most

effective medical care for an arrested suspect." *Tatum*, 441 F.3d at 1098 (internal citation omitted).  A police officer who promptly summons medical assistance acts reasonably under the Fourth Amendment.  *Id.* at 1099.

In *Tatum*, two officers arrested a man by bringing him to the ground and handcuffing him.  *Tatum*, 441 F.3d at 1093.  The officers placed the man on the ground for about a minute as they restrained him.  *Id.*  After arresting the man, the officers laid the arrestee on his side.  *Id.*  About two minutes later, the officers requested an ambulance because they noticed the arrestee was breathing heavily and that his eyes were bulging.  *Id.* Once the officers noticed that the arrestee's breathing became shallow, they requested an ambulance be given priority to their location.  *Id.*  Although the officers did not perform CPR on the arrestee, they checked on his breathing, his pulse rate, and chest movements.  *Id.* The paramedics who arrived on scene ten minutes later could not detect the arrestee's pulse.  *Id.*  The arrestee was declared dead at the scene.  *Id.*

The Ninth Circuit concluded that the officers in *Tatum* provided necessary medical care by requesting an ambulance for the arrestee.  *Id.* at 1099. The court noted that the officers acted appropriately by monitoring the arrestee's breathing after calling for an ambulance.  *Id.*  The plaintiff, the arrestee's mother, suggested that the officers should have performed CPR on the arrestee while the ambulance was on route.  *Id.*  But the Ninth Circuit rejected this position.  *Id.*  Even if the officers knew how to administer CPR, they complied with the Fourth Amendment by promptly requesting medical assistance, "and the Constitution required them to do no more."  *Id.*

Unlike *Tatum*, the court in *Ostling* held that the officers there were not entitled to summary judgment on a failure to provide post-arrest medical care claim.  In *Ostling*, officers believed that a man—suffering from either schizophrenia or Asperger's—was locked in his apartment and was wielding an ax.  *Ostling*, 872 F. Supp. 2d at 1122.  When the man suddenly opened his apartment door with an ax in hand, an officer tried to tase the man, but failed.  *Id.* at 1122-23.  The officer testified that the man then moved quickly toward him with the ax.  *Id.* at 1123.  In response, the officer fired three shots in quick

succession.  *Id.* In between the shots, the man was able to shut his apartment door.  *Id.*  It was undisputed that two shots passed through the apartment door and struck the man in the left leg.  *Id.*  There was no dispute that even though the paramedics arrived within nine minutes of the shooting, no one rendered aid to the man until one hour and twenty minutes after the shooting.  *Id.*  In that intervening time, the police cordoned off the apartment, called in SWAT officers, and prevented the man's father from using a ladder to check on the man through a skylight.  *Id.*  The man was struck in the femoral artery and bled to death by the time medics reached him—approximately 90 minutes after being shot.  *Id.* The man's family sued the officer who shot him.  *Id.*  The denied summary judgment to the officer on whether he failed to take reasonable steps to secure medical aid to the man because defendants could not explain why they had taken nearly an hour-and-a-half to check on the man's condition.  *Ostling*, 872 F. Supp. 2d at 1130.

This case is more like *Tatum* than *Ostling*.  Once the Officers secured Kyle, they immediately called for the paramedics—who were being staged—to treat him.  *Id.* at ¶¶ 14-15.  Indeed, the Officers here responded more quickly than in *Tatum* because they did not wait for an obvious medical symptom to arise before calling for paramedics.  *Compare id.* at 15, *with Tatum*, 441 F.3d at 1093 (requesting an ambulance after noticing arrestee's eyes bulging and breathing heavily).  According to *Tatum*, once the Officers summoned the paramedics from the staging area, they fulfilled their constitutional obligation.  *Tatum*, 441 F.3d at 1099.

Plaintiffs' contention that the Officers delayed medical care by staging paramedics rather than have them immediately treat Kyle upon arriving at scene are unavailing.  Opp'n at 12-13.  An officer does not have a duty under the Fourth Amendment to procure medical aid until *after* an arrest in made.  *See Tatum*, 441 F.3d at 1099.  Thus, the Officers did not have an obligation to secure medical aid for Kyle until they succeeded in placing handcuffs on him.[7]  About five minutes elapsed between the Officers arresting Kyle and the Officers allowing the paramedics to tend to him.  SAF at ¶ 108.  In that time

---

[7] Because the Court is required to view facts in the light most favorable to the Brioneses, the Court assumes that Kyle was arrested when he was handcuffed—not when the hobble was placed on him.

frame, the Officers checked on Kyle's breathing and pulse and placed a hobble on him to prevent him from kicking.  SUF at ¶ 16; *Id.* at ¶ 105.  The Officers were allowed to ensure Kyle was subdued before calling for the paramedics from the staging area.  *See Alford*, 785 F. Supp. 2d at 880 (holding that first responders need not face safety risks in trying to render aid).  Based on these facts, no reasonable factfinder could conclude that the Officers unreasonably delayed medical treatment for Kyle.  The facts here are in stark contrast to *Ostling*, in which the officer prevented medical personnel from providing treatment for an hour-and-a-half while failing to check on the suspect's condition. *Ostling*, 872 F. Supp. 2d at 1130.

Even when the facts are viewed in the light most favorable to Plaintiffs, the Officers did not violate Kyle's right to receive post-arrest medical care.  Thus, the Court **GRANTS** Defendants' MSJ on Plaintiffs' right to receive post-arrest medical care claim.

### 3. Interference with Familial Relationship

Defendants move for summary judgment on the Brioneses' familial relationship claim on the basis that there is no evidence that the Officers either acted with deliberate indifference or with a purpose to harm.  MSJ at 9-10.  In fact, Defendants assert that the Officers constantly checked on Kyle to ensure that he could breathe.  *Id.* at 10.  As a preliminary matter, Plaintiffs contend that the "deliberate indifference" standard—not the "purpose to harm" standard—should apply because the Officers had ample time to reflect and deliberate in responding to Kyle.  Opp'n at 15.  But Plaintiffs add that even if the "purpose to harm" standard applied, the Officers' conduct "shocks the conscience" considering the force they applied to arrest Kyle.  *Id.* at 16.

Parents have a Fourteenth Amendment liberty interest in the companionship and society of their children.  *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010); *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991).  Official conduct that 'shocks the conscience' in depriving parents of that interest is cognizable as a violation of due process."  *Id.*; *see also Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  In determining whether an officer's force shocks the conscience, the court first

asks whether the circumstances of the case allowed the officer to have actual deliberation. *Wilkinson*, 610 F.3d at 554.  Deliberation is impractical where a suspect's evasive actions force the officers to act quickly or when dealing with other fast paced situations posing safety concerns. *Tatum v. Moody*, 768 F.3d 806, 821 (9th Cir. 2014).

Where actual deliberation is possible, the plaintiff must show that the defendant acted with "deliberate indifference" such that the challenged conduct "shocks the conscience." *Wilkinson*, 610 F.3d at 554.  Deliberate indifference involves the conscious or reckless disregard of the consequence of one's acts or omissions.  *Moody*, 768 F.3d at 821 (citing *Gnatt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013)).  That is, to show deliberate indifference, a plaintiff must show more than negligence, but does not need to show an officer understands that the specific harm will occur.  *Moody*, 768 F.3d at 821.  On the other hand, to satisfy the purpose to harm standard, a plaintiff must show that the officer's goal was to cause harm unrelated to a legitimate law enforcement objective.  *Porter*, 546 F.3d at 1140.

Here, the facts surrounding the method of Kyle's arrest are undisputed:  he was placed in a prone position, there was resistance, and the Officers placed their hands and knees on Kyle's back, head, and knees.  The Court may determine whether the deliberate indifference standard or the purpose to harm standard applies if the undisputed facts clearly point to one standard.  *Garlick*, 167 F. Supp. 3d 1117, 1165 (E.D. Cal. 2016).  The undisputed evidence, including the body camera video, shows that there was no point between Kyle being removed from the car and being handcuffed in which the Officers broke contact with him.  SAF at ¶¶ 46-102, 103-105.  During the entire encounter, the Officers were trying to restrain and subdue Kyle.  *See id.*  Just as the entire encounter in *Porter* lasted five minutes, the entire encounter here lasted less than 10 minutes.  *Id.* at ¶ 100 (noting that officers asked Kyle if he could breathe five minutes after he was taken to the ground).  Because the Officers were in the midst of detaining Kyle during the entire encounter, they did not have time to actually deliberate.  *See Zion v. Cty. of Orange*, 874

F.3d 1072, 1077 (9th Cir. 2017).   Thus, under Ninth Circuit precedent, the purpose to harm standard applies.

Applying the purpose to harm standard, the Court concludes that Defendants are entitled to summary judgment on Plaintiffs' familial association claim.   It is undisputed that the Officers pressed on Kyle's back, head, and knees while he was prone to the ground.   *See* SAF at ¶¶ 82, 86, 92-96, 98-99, 141.   And Plaintiffs have introduced evidence that at least one officer was aware that applying pressure to Kyle while he was in the prone position could make it difficult for him to breathe.   *Id.* at ¶ 164.   But neither these facts nor the remaining evidence, viewed in the light most favorable to Plaintiffs, show that Defendants acted with a purpose to harm unrelated to a law enforcement objective.   Plaintiffs have not introduced evidence that the Officers intended to hurt Kyle. For instance, there is no evidence that Defendants were laughing or treating Kyle callously.   *Cf. Drummond*, 343 F.3d at 1055 (evidence that officers were obviously causing suspect to have trouble breathing and laughing about the events in Fourth Amendment case).   In fact, the undisputed facts show that the Officers checked on Kyle's pulse, asked whether he was breathing, and turned him to his side after he was subdued. SAF at ¶¶ 101-02, 112-13, 117, 123.   There is no evidence that the Officers acted with ill-will or sought to "get even."   *Wilkinson*, 610 F.3d at 554.

The Court disagrees with Plaintiffs' contention that the Officers' use of force was extreme enough to give rise to liability under the purpose to harm standard.   In *Zion*, the Ninth Circuit held that officers did not act with a purpose to harm by "emptying his weapon" at the suspect because the shots "came in rapid succession, without time for reflection."   *Zion*, 874 F.3d at 1077.   Based on a consideration of binding Ninth Circuit authority, the Court concludes that the uncontroverted evidence in this case viewed in the light most favorable to Plaintiffs does not give rise to a triable issue of fact as to whether the Officers acted with a purpose to harm during the process of restraining him.

Because the Brioneses have not shown that the Officers acted with a purpose to harm in the process of arresting Kyle, the Court **GRANTS** Defendants' MSJ on Plaintiff's familial relationship claim.

**B.**    *Monell* **Liability**

Aside from the Officers' individual liability, Plaintiffs also contend that Ontario is liable for the acts of the Officers based on *Monell*.  Plaintiffs argue that Ontario is liable under 42 U.S.C. § 1983 for the Officers' actions under three theories: (1) ratification; (2) inadequate training; and (3) unconstitutional custom, practice, or policy.  *See generally* Second Amendment Complaint ("SAC") at ¶¶ 58-86 (Doc. # 29).  Defendants have moved for summary judgment for Ontario on each of these theories.  MSJ at 11.  The Court will consider each argument in turn.

**1.  Ratification**

Defendants contend that the Brioneses have no evidence that any policymaker for Ontario ratified the Officers' conduct.  *Id.* at 12.  Plaintiffs respond that Ontario ratified the Officers' conduct because neither Ontario nor Ontario PD reprimanded or retrained any of the Officers after the incident involving Kyle.  Opp'n at 23.

A municipality may be liable under 42 U.S.C. § 1983 if an official with final policy-making authority "ratified a subordinate's unconstitutional decision or action and the basis for it." *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (*en banc*).  "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).  The authorized policymaker must make an affirmative choice in choosing a course of action. *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992).  Failing to discipline an employees' misconduct is not enough to show ratification. *Clouthier*, 591 F.3d at 1253. The question of who is a final policymaker is a question of state law. *Praprotnik*, 485

U.S. at 123 (plurality opinion).  And although ratification is a question for the jury, a plaintiff must establish a genuine issue of material fact regarding whether ratification occurred.  *Iopa*, 176 F.3d 1231, 1238-39 (9th Cir. 1999).

Plaintiffs' argument in support of ratification mirrors plaintiffs' in *Clouthier*.  As in this case, the plaintiffs in *Clouthier* contended only that "the County ratified employees' conduct by failing to discipline the employees who violated [their] constitutional rights."  *Clouthier*, 591 F.3d at 1253.  The Ninth Circuit held this allegation did not create a triable issue of fact because plaintiffs had not shown who the final policymaker was or that anyone made a conscious, affirmative decision to approve the employees' actions.  *Id.*  Indeed, "[h]olding the County [in *Clouthier*] liable for the missteps of its employees [would] amount to de facto *respondeat superior* liability, an avenue rejected in *Monell*."  *Id.* at 1254 (quotation marks and citation omitted).

Here, Plaintiffs rest their ratification theory on the fact that the Officers were not reprimanded and not retrained in response to this incident.  Opp'n at 23; SUF at ¶ 18 (citing Plaintiffs' interrogatory response that the evidence showing a policymaker knew of and approved its subordinate's constitutional violation is "There is no evidence in this case that the individual officer defendants were disciplined, fired, or retrained in response to their conduct with this incident.").  But as was explained in *Clouthier*, failure to discipline is insufficient in itself to create a dispute of material fact on a ratification theory.  *Clouthier*, 591 F.3d at 1253.  Thus, the Court **GRANTS** Defendants' motion for partial summary judgment on Plaintiffs' ratification claim.

### 2.    Failure to Train

Next, Defendants contend that Plaintiffs have not shown that Ontario fails to train its officers about the dangers of positional and restraint asphyxia.  MSJ at 13.  Plaintiffs point out, however, that Defendants' Rule 30(b)(6) deposition of Detective Darryl Lauritzen shows that Ontario does not train its officers about the dangers of positional and restraint asphyxia.  Opp'n at 19.  Moreover, Plaintiffs argue that the dangers of

-18-

positional and restraint asphyxia should be obvious based on *Drummond* and *Garlick*. *Id.* at 18-19.

"[A] local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of 1983," but "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To show such inadequacy, Plaintiffs must show that Ontario's failure to train or adequately supervise the Officers "amounts to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact,'" which is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (2000) and *City of Canton v. Harris*, 489 U.S 378, 388 (1989)). Accordingly, the City's policymakers must have been "on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Connick*, 563 U.S. at 61. "[D]e facto *respondeat superior* liability" "would result" if the Court applied a lower standard. *Id.* at 62 (quoting Canton, 489 U.S. at 392). To show that a municipality is liable for failure to train, Plaintiffs must either present a "pattern of similar constitutional violations by untrained employees" or they must show that the municipality "has failed to train its employees to handle recurring situations presenting an obvious potential for" constitutional violations. *Id.*

Here, Plaintiffs present no evidence that there is a pattern of Ontario PD officers suffocating persons they arrest. *See generally* SAC at ¶¶ 67-75. Rather, relying on *Drummond* and *Garlick*, Plaintiffs contend that the risk of asphyxia during arrest is so obvious, that a single violation may create municipal liability based on failure to train. Opp'n at 18-19. Defendants argue that *Drummond* and *Garlick* are inapposite because those cases concern officers who applied pressure to an arrestee's back *after* he was handcuffed, as opposed to during the process of arresting him. Reply at 16-17.

-19-

1     Defendants' distinction is not meaningful.   The "obvious" proposition from
2  *Drummond* and *Garlick* is that body-weight force—e.g., laying on someone's back, neck
3  or head—can prevent one from breathing, particularly where, as here, Kyle's face and
4  chest were pressed down against soft dirt.   Plaintiffs have introduced just enough
5  evidence to create a triable issue of material fact as to whether Ontario adequately trained
6  its officers.   It is true Ontario trains its officers that laying a detainee prone to the ground
7  could make it difficult for the detainee to breathe.   SAF at ¶¶ 159, 163-64.   And it is also
8  true that the Officers were trained by basic Peace Officer Standards and Training.   SUF at
9  ¶¶ 19-24.   But Plaintiffs have introduced evidence, i.e., the deposition of Sergeant Cross,
10  showing that Ontario trains its officers to handcuff a subject before removing him from a
11  prone position.   SAF at ¶ 153.   Moreover, Sergeant Cross testified that Ontario did not
12  train him about the dangers of applying pressure to a detainee's back while he or she is in
13  a prone position.   *Id.* at ¶ 157.   Because there is a dispute over whether Ontario properly
14  trained the Officers about the dangers of positional and restraint asphyxia, Defendants'
15  motion for summary judgment on Plaintiffs' failure to train claim is **DENIED**.

16        **3.    Official Custom or Policy**

17        Finally, Defendants argue that Plaintiffs have not produced any evidence showing
18  that Ontario had an unconstitutional policy to justify subjecting it to *Monell* liability.
19  MSJ at 14-15.   In response, Plaintiffs contend that Ontario did not adopt a policy
20  prohibiting officers from applying pressure on one's back, even though they knew that
21  the practice could cause positional and restraint asphyxia.   Opp'n at 23.

22        To show that the government had a policy or custom leading to *Monell* liability, a
23  plaintiff must prove:  (1) he had a constitutional right of which he was deprived, (2) the
24  municipality had a policy, (3) the policy amounts to deliberate indifference of his
25  constitutional right, and (4) the policy is the moving force behind the constitutional
26  violation.   *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).   "Official
27  municipal policy includes the decisions of a government's lawmakers, the acts of its
28  policymaking officials, and practices so persistent and widespread as to practically have

the force of law." *Connick*, 563 U.S. at 61. "But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *City of Oklahoma v. Tuttle*, 471 U.S. 808, 824 (1985). The lack of an official policy could be grounds to find that training is inadequate. *See id.* at 824 n.8. "Whether a local government entity has displayed a policy of deliberate indifference is generally a question for the jury." *Oviatt v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992).

Here, there is a dispute of material fact as to whether Ontario's lack of procedures prohibiting officers from applying body-weight pressure to detainees' backs while prone caused Kyle a constitutional injury. Plaintiffs also have shown that Defendants' policies allow detainees to be placed chest and face down for a prolonged time. SAF at ¶ 153. In fact, the evidence shows that Ontario's policy requires officers to secure handcuffs on detainees before turning the detainee around or checking on his ability to breathe. *Id.* According to Plaintiffs' expert, this policy is out-of-line with current police practice. *Id.* at ¶ 143. Viewing the facts in the light most favorable to Plaintiffs, a reasonable juror could conclude that Ontario's policy (or lack thereof) was deliberately indifferent to detainees' rights. As such, the Court **DENIES** summary judgment on Plaintiffs' *Monell* claim for lack of an adequate policy.

## C.   False Arrest and False Imprisonment

Defendants also move for summary judgment on Plaintiffs' false arrest and false imprisonment claim on the same basis as its claim for detention without reasonable suspicion and arrest without probable cause. MSJ at 15 (citing *Ramirez v. Cty. of Los Angeles*, 397 F. Supp. 2d 1208, 1228 (C.D. Cal. 2005)). Although the Court granted Defendants summary judgment on Plaintiffs' claim for unreasonable detention and arrest, it did so because the Officers are protected by qualified immunity. Qualified immunity, however, does not protect the Officers from common law state torts. *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1171 (9th Cir. 2013) ("[T]he doctrine of

qualified immunity does not shield defendants from state law claims."). Moreover, California state law explicitly prohibits the Court from conferring immunity in false arrest and imprisonment cases. Cal. Gov't Code § 820.4 ("A public employee is not liable for his act or omission, exercising due care, in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."); *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1379 (9th Cir. 1998). As discussed above, a triable issue of fact exists as to the existence of reasonable suspicion for detention and probable cause for arrest. The Court therefore **DENIES** Defendants' motion for summary judgment on Plaintiffs' state law claim for false arrest and false imprisonment.

## V.

## CONCLUSION

In light of the foregoing, the Court:

(1) **GRANTS** Defendants' motion for partial summary judgment on Plaintiffs' First (unreasonable detention and arrest), Third (denial of medical care), and Fourth Claims (interference with familial relationship) for violation of 42 U.S.C. § 1983;

(2) **GRANTS** Defendants' motion for partial summary judgment on Plaintiffs' Fifth Claim (ratification) for *Monell* liability;

(3) **DENIES** Defendants' motion for partial summary judgment on Plaintiffs' Sixth (inadequate training) and Seventh Claims (unconstitutional custom, practice, or policy) for *Monell* liability; and

(4) **DENIES** Defendants' motion for partial summary judgment on Plaintiffs' Eighth Claim (false arrest/imprisonment under California common law).

**IT IS SO ORDERED.**

DATE: May 21, 2018

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE